# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **CAROLINE DIANA PARKER** | ) | |
| Plaintiff | ) | Civil Action No. 2:23cv00001 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MARTIN J. O'MALLEY[1],** | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |
| | ) | |

*I. Background and Standard of Review*

Plaintiff, Caroline Diana Parker, ("Parker"), filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying her claim for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C. §§ 423 and 1381 *et seq.* Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B). Neither party has requested oral argument; therefore, this case is ripe for decision. As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached

---

[1] Martin J. O'Malley, ("O'Malley"), became the Commissioner of Social Security on December 20, 2023. Pursuant to Federal Rules of Civil Procedure Rule 25(d), O'Malley should, therefore, be substituted for Kilolo Kijakazi as the defendant in this case. Pursuant to the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), no further action is required to continue this suit.

through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Parker protectively filed her applications for DIB and SSI on May 20, 2019, alleging disability as of May 13, 2019, based on Cushing's syndrome[2], anxiety, depression and a brain tumor in remission/removed.  (Record, ("R."), at 92, 100, 273-74, 280-88.) The claims were denied initially and upon reconsideration. (R. at 170-75, 178-79, 181-85.) Parker then requested a hearing before an administrative law judge, ("ALJ"). (R. at 187-88.) The ALJ held a hearing on September 28, 2021, at which Parker was represented by counsel. (R. at 61-83.) There was a subsequent hearing on February 10, 2022, where the ALJ scheduled a physical consultative examination for Parker and continued the proceedings pending the results of that examination and to provide Parker with time to provide updated medical records to the court. (R. at 84-91.)

---

[2] Cushing's syndrome is a hormonal disorder that occurs when the body has too much of the hormone cortisol over a long time. The main symptoms of Cushing's syndrome are a fatty hump between the shoulders, a round face and pink or purple stretch marks on the skin. It can also cause hypertension, bone loss and, sometimes, type 2 diabetes. *See* mayoclinic.org/diseases-conditions/cushing-syndrome/symptoms-causes/syc-20351310 (last visited Mar. 4, 2024).

By decision dated August 31, 2022, the ALJ denied Parker's claim. (R. at 39-54.) The ALJ found Parker meets the nondisability insured status requirements of the Act for DIB purposes through December 31, 2024. (R. at 40, 42.) The ALJ found Parker had not engaged in substantial gainful activity since May 13, 2019,[3] the alleged onset date. (R. at 42.) The ALJ determined that Parker had severe impairments, namely, Cushing's syndrome; hypothyroidism; lumbar and cervical degenerative changes; T-11 compression fracture; osteoarthritis of the thumbs; obesity; major depressive disorder; generalized anxiety disorder; post-traumatic stress disorder ("PTSD"); and attention deficit disorder, but he found Parker did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 42-45.)

The ALJ found that Parker had the residual functional capacity to perform medium work,[4] except she could frequently perform postural activities; frequently handle and occasionally finger; understand, remember and apply simple instructions and perform simple, unskilled tasks; occasionally interact with others, but should work independently and not in tandem with others; adapt to occasional changes in a customary workplace setting; and was expected to be off task for 10 percent of the workday. (R. at 46.) The ALJ found Parker was unable to perform any past relevant work. (R. at 52.) Based on Parker's age, education, work history, residual functional

---

[3] Therefore, Parker must show she was disabled between May 13, 2019, the alleged onset date, and August 31, 2022, the date of the ALJ's decision, to be eligible for DIB benefits.

[4] Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, she also can do sedentary or light work. *See* 20 C.F.R. §§ 404.1567(c), 416.967(c) (2023).

capacity and the testimony of a vocational expert, the ALJ found a significant number of jobs existed in the national economy that Parker could perform, including the jobs of a linen room attendant, a checker and a marker. (R. at 53-54.) Thus, the ALJ concluded that Parker was not under a disability as defined by the Act from the alleged onset date of May 13, 2019, through the date of the decision, and she was not eligible for DIB or SSI benefits. (R. at 29.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2023).

After the ALJ issued his decision, Parker pursued her administrative appeals, (R. at 1-35, 271-72, 446-47), but the Appeals Council denied her request for review. (R. at 1-6.) Parker then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2023). This case is before this court on Parker's motion for summary judgment filed April 18, 2023, and the Commissioner's motion for summary judgment filed May 18, 2023.

## II. Facts

Parker was born in 1965, (R. at 65), which, at the time of the alleged onset of disability, classified her as a "person closely approaching advanced age" under 20 C.F.R. §§ 404.1563(d), 416.963(d), and at the time of the ALJ's decision, Parker was a "person of advanced age" under 20 C.F.R. §§ 404.1563(e), 416.963(e). Parker has high school education and one year of college, and she previously worked as a nursing assistant, an ophthalmic assistant and a personal care aide for an elderly woman. (R. at 65-67, 79-80.)

In rendering his decision, the ALJ reviewed records from Dr. Raymond Ryan, M.D., consultative examiner; Carol S. McCleary, Psy.D., and Yaiza Vidal Sostre, M.A., Q.M.H.P., consultative examiners; Stephen Saxby, Ph.D., a state agency psychologist; Leslie Montgomery, Ph.D., a state agency psychologist; Dr. Wyatt Beazley, III, M.D., a state agency physician; Dr. Robert McGuffin, M.D., a state agency physician; Dr. Daniel D. Carroll, M.D., at Wellmont Medical Associates; Dr. Jonathan Clark, M.D., at Appalachian Orthopaedic Associates; Michael Lilly, L.P.C., at Frontier Health; Dr. Mary Lee Vance, M.D., at University of Virginia Health ("U.Va."); and Indian Path Community Hospital.

By way of background, in October 2016, Parker was diagnosed with a pituitary macroadenoma, which caused her to develop Cushing's syndrome. (R. at 449.) Primary care records indicate that Parker was diagnosed with attention deficit hyperactivity disorder, predominantly inattentive type, ("ADD/ADHD"), in 2013, (R. at 461), anxiety and depression in 2014, (R. at 461), Cushing's syndrome in 2017, (R. at 460), hypothyroidism in 2018, (R. at 460), and obesity in 2018. (R. at 457-58.)

On May 22, 2019, Parker contacted Dr. Mary Lee Vance, M.D., a U.Va. endocrinologist, who managed Parker's levothyroxine prescription to ask if she needed to fast for bloodwork that was being completed locally. (R. at 451.) Parker indicated to Dr. Vance's office that she was concerned her Cushing's syndrome was recurring. (R. at 451.) On May 24, 2019, Dr. Vance's office received a refill request for Parker's levothyroxine, but declined the request because Parker was last prescribed a three-month supply of the medication on January 18, 2019, and Parker's last appointment with Dr. Vance was in July 2017. (R. at 451.) Parker then contacted

-5-

Dr. Vance's office on June 10, 2019, to request a levothyroxine refill, but was told by the office that she would need to schedule an appointment, which she did for September of the same year. (R. at 451.) Parker next contacted Dr. Vance's office on July 2, 2019, to request that Dr. Vance review her lab results and approve a reduction in her thyroid medication that Parker's primary care physician had recommended. (R. at 450.) After being told by Dr. Vance's office that they did not have Parker's most recent lab results, Parker indicated that she would contact her primary care office to have the records faxed to Dr. Vance.[5] (R. at 450.) A records request sent to U.Va. for records from August 7, 2019, to September 18, 2019, was returned with no records found. (R. at 565-67.) Another request was completed for medical records between September 18, 2019, to May 19, 2020. (R. at 630.) These records indicate that Parker contacted Dr. Vance on January 15, 2020, to schedule a two-year follow up, which was scheduled, but Parker later called to reschedule, and the appointment was then rescheduled to May 21, 2020. (R. at 634-35.) Parker called Dr. Vance's office on April 1, 2020, to ask about test results from a test her primary care physician had ordered, and Dr. Vance's office told Parker that because she had not been seen at the office in three years, that Dr. Vance was unable to interpret any of her test results. (R. at 634.) Parker had a phone appointment with Dr. Vance on April 20, 2020, and Dr. Vance requested that Parker follow up with her in one year. (R. at 632-33.) Dr. Vance expressed concerns about Parker's weight and blood sugars, but did not have any concerns that Parker's Cushing's syndrome was recurring. (R. at 632-33.) A records request from May 19, 2020, to September 2, 2020, shows that Parker did not contact Dr. Vance's office during this time, but she did have a follow-up appointment scheduled for April 20, 2021. (R. at 704-08.)

---

[5] During the June 10, 2019 phone call, Dr. Vance's nurse indicated that the lab results were available in Dr. Vance's box. However, this is contradicted by the July 2, 2019, phone call where a different nurse indicated that the lab results had not been received by the practice. (R. at 450.)

However, there are no treatment notes in the record to indicate that Parker has had contact with Dr. Vance since April 20, 2020.

Parker's primary care physician, Dr. Daniel D. Carroll, M.D., at Wellmont Medical Associates, treated Parker throughout the relevant May 2019 to August 2022 period. On May 15, 2019, Parker requested a 90-day supply of her prescriptions for levothyroxine, Paxil, Effexor and Seroquel, indicating that her insurance would soon be running out. (R. at 473.) On May 20, Parker called requesting a refill of her Xanax prescription. (R. at 472-73.) On June 4, Parker had an office visit with a physicians assistant at the practice to express concerns that her Cushing's syndrome was returning because she was experiencing memory-related symptoms, and she requested lab work prior to an upcoming follow-up appointment at U.Va. (R. at 469.) Parker also stated that she had recently lost her job and was experiencing worsening depression and weight gain, although she had never taken the phentermine that Dr. Carroll had prescribed her previously for weight loss. (R. at 469.) Parker also reported fatigue, unexpected weight change, decreased concentration and memory loss. (R. at 470.) On June 17, Parker requested a refill of her Xanax prescription, but it was not yet due to be refilled. (R. at 468.) On June 20, Dr. Carroll's office refilled Parker's Xanax prescription. (R. at 467.) On July 3, Parker saw Dr. Carroll for anxiety, citing that her symptoms were decreased concentration, depressed mood, dizziness, excessive worry, irritability, malaise, muscle tension, nervous and anxious behavior, palpitations, panic, restlessness and shortness of breath, non-restorative sleep and several nighttime awakenings. (R. at 464.) Parker also stated that she had decreased concentration, dysphoric mood, weakness, arthralgias and myalgias, shortness of breath, and fatigue. (R. at 465.) She denied back pain, gait problems, joint swelling, neck pain and stiffness, agitation,

confusion or sleep disturbances. (R. at 465.)  In his physical examination, Dr. Carroll noted that Parker had normal reflexes, coordination, muscle tone, range of motion, speech, behavior, judgment, thought content, cognition and memory, and she had an anxious and depressed mood. (R. at 466.) On July 24, Parker requested a refill of her Xanax prescription, and Dr. Carroll's office told her that she needed to complete a urine drug screening first, which Parker completed the next day. (R. at 462-63.) When Parker called the practice on July 26 to request the Xanax refill, stating that she had been out of the medication for a couple of days, she was told by the practice that they could not refill her prescription on the weekend and to go to an urgent care or the emergency room if she began to withdraw from the medication. (R. at 462.) However, Dr. Carroll refilled Parker's Xanax prescription that same day. (R. at 461.)

On September 24, 2019, Parker requested a Xanax refill from Dr. Carroll, and he refilled it. (R. at 594.) On October 31, Parker again called Dr. Carroll for a Xanax refill, and on November 7 she requested a Seroquel refill, both of which were filled by Dr. Carroll. (R. at 593-94.) On November 25, Parker requested a refill of Xanax, which Dr. Carroll filled on December 3. (R. at 593.) On December 26, Parker saw Dr. Carroll's nurse practitioner for a follow up on her anxiety. (R. at 589.) At this appointment, Parker indicated that she had taken the last Xanax pill from her prescription the previous day. (R. at 589.) Parker's description of her anxiety symptoms remained unchanged from the July 3, 2019, appointment. (R. at 464, 589.) She attested to being 76 to 100 percent compliant with her medications and that the side effects of her medications were joint pain, limb pain and gastrointestinal issues. (R. at 589.) On a review of systems, Parker reported having shortness of breath, heart palpitations, heat intolerance, arthralgias, dizziness, decreased concentration, dysphoric mood and sleep disturbance. (R. at 591.) Parker denied back pain, gait

problems, joint swelling, myalgias, neck pain and stiffness, confusion, depression or memory loss. (591.) The nurse practitioner completed a physical examination and noted that Parker's neck did not have any thyroid masses or thyromegaly; she had a normal heart rate and rhythm; normal strength, reflexes, coordination and gait; normal judgment, thought content, cognition and memory; and her mood appeared anxious and depressed. (R. at 591-92.) The nurse practitioner further noted that Parker was last evaluated by Dr. Vance in 2017 and had not followed up as directed. (R. at 592.) Parker declined the nurse practitioner's offer to schedule an endocrinology appointment for her, but agreed to do labs to check her thyroid levels. (R. at 592.)

On January 2, 2020, labs were completed, and on January 7, Parker contacted Dr. Carroll's office to inquire about the results. (R. at 586.) On January 27, Parker called the office to request a refill of her Xanax, which was filled on January 31. (R. at 584-85.) On February 4, the office faxed the lab work results to U.Va. and called Parker to request that she follow up with Dr. Vance, as well as Dr. Carroll's office in two months for monitoring of Rybelsus, a new weight loss medication that was prescribed. (R. at 584.) During February 2020, Parker contacted Dr. Carroll's office to request prior authorizations on her Effexor and Rybelsus prescriptions. (R. at 583-84.) On March 5, Parker contacted Dr. Carroll's office to ask for a refill of her Xanax prescription, which he refilled that same day. (R. at 583.) On March 31, Parker saw Dr. Carroll's nurse practitioner with complaints of hypothyroidism, neck pain, back pain and hand pain. (R. at 579.) Parker reported that her hypothyroidism symptoms included unexpected weight change, fatigue, weakness, hair loss and dry skin. (R. at 579.) She indicated that her neck pain had begun more than a year ago, was intermittent, unchanged, present in the midline, aching, aggravated by bending and

position and rated at a severity of four on a scale of one to 10. (R. at 579.) Parker further reported that her lumbar back pain had begun about six months ago and was intermittent, waxing and waning since onset, shooting and stabbing in nature and was aggravated by bending. (R. at 579.) Parker rated the pain in her back as a five on a scale of one to 10. (R. at 579.) Regarding the hand pain, Parker reported that it had been ongoing for about a year, was aching, not radiating, rated as a severity of three out of 10 and was accompanied by swelling. (R. at 579.) Parker indicated that NSAIDS and bed rest provided mild relief for all three painful areas. (R. at 579.) Parker further complained of arthralgias, back pain, gait problems, joint swelling, myalgias, neck pain, weakness, confusion, depression, dysphoric mood, nervousness and anxiousness. (R. at 581.) The nurse practitioner's physical examination showed that Parker had tenderness and bony tenderness in her cervical and lumbar back, but a normal range of motion in both, and that she had a normal mood, affect, behavior, speech, judgment, thought content, cognition and memory. (R. at 582.) The nurse practitioner ordered x-rays of the spine, prescribed Norflex and Tylenol arthritis and instructed Parker to follow up with Dr. Vance for her hypothyroidism. (R. at 582.)

On April 1, Dr. Carroll's office called Parker to relay the imaging results, referring Parker to orthopedics for arthritis in her hand, and to physical therapy for degenerative changes and spondylolisthesis in her spine. (R. at 578.) On April 14, Parker called Dr. Carroll's office to ask for a refill of her Xanax prescription, for a prior authorization of her Effexor and to ask for the referral information for her hand. (R. at 577-78.) Dr. Carroll refilled the Xanax prescription on April 14, and the office was able to get insurance approval for the Effexor on April 16. (R. at 577.) On April 22, after a phone appointment with Dr. Vance at U.Va. Parker called Dr. Carroll's office to request an adjustment of her levothyroxine medication pursuant to Dr.

Vance's recommendation, and the office adjusted the prescription. (R. at 576-77.) In May 2020, Parker contacted Dr. Carroll's office for Xanax and Paxil refills, and these were refilled. (R. at 729.)   On May 28, Parker saw Dr. Carroll's nurse practitioner for anxiety, ADHD/ADD and a rash. (R. at 726.) Parker reported that her anxiety symptoms were decreased concentration, depressed mood, excessive worry, irritability, malaise, muscle tension and nervous and anxious behavior. (R. at 726.) She denied nighttime awakenings, stated that she had good quality of sleep and indicated that the symptoms were moderately severe and occurred occasionally. (R. at 726.)  Parker reported that her ADHD/ADD symptoms had been present for years and included a poor attention span, being easily distracted, difficulty following instructions, losing items necessary for an activity, engaging in physically dangerous activities and shifting from one uncompleted task to another. (R. at 726.) Parker also reported fatigue, irritability, nervousness, anxiety, arthralgias and myalgias, back pain, decreased concentration, dysphoric mood and sleep disturbances. (R. at 727-28.) Parker denied gait problems, joint pain, joint swelling, neck pain and stiffness, behavioral problems, confusion and insomnia. (R. at 727-28.) The nurse practitioner performed a physical examination and found no masses in Parker's thyroid, as well as a normal mood, affect, speech, behavior, judgment, thought content, cognition and memory. (R. at 728.) Parker requested to be placed on Adderall for her ADHD/ADD, and the nurse practitioner indicated that due to contraindications between Xanax and a stimulant medication, that she must wean off of Xanax before Adderall would be considered. (R. at 729.) Parker indicated that because she was not working, her anxiety was controlled and that she had been taking less Xanax than she was prescribed, so she felt that she could eliminate this medication. (R. at 729)

On June 29, Parker saw Dr. Carroll's nurse practitioner again, indicating that she felt an increase in her anxiety after trying to discontinue Xanax use, and she did not want to wean off of it. (R. at 725.) Her anxiety was described as mild with the same symptoms as the previous month. (R. at 722, 726.) Parker also described constant, moderate shooting pain in the lumbar spine and gluteal area that was aggravated by bending, changing position, standing, sitting and twisting. (R. at 722.) She also complained of hypothyroid symptoms, including unexpected weight change, fatigue, hair loss, dry skin, depressed mood, irritability, anxiety, myalgias, arthralgias and depression. (R. at 722.) The symptoms were described as mild and stable. (R. at 722.) Parker further reported gait problems, but denied joint swelling, behavioral problems, confusion, dysphoric mood and sleep disturbances. (R. at 724.) The nurse practitioner performed a physical examination that showed no thyroid masses and that Parker had a normal mood, affect, speech, behavior, judgment, thought content, cognition and memory. (R. at 724-25.)  The nurse practitioner told Parker to do exercises and encouraged weight loss for the back pain. (R. at 725.)

Later that day, Parker presented to Indian Path Community Hospital with complaints of back pain that had begun one to two hours prior and was initiated by Parker bending over and then climbing stairs. (R. at 671, 674.) Parker reported that she was unable to take opiate pain medications or steroids, but that she would like to try a muscle relaxer. (R. at 675.) Imaging taken at the hospital showed a mild compression fracture of the T-11 vertebra with a possible very mild compression fracture of the T-12 vertebra. (R. at 669.) Parker was discharged from the hospital after about four hours. (R. at 668.) On July 1, Parker told Dr. Carroll's office that she had recently been to the emergency room and was told to follow up with her primary care provider. (R. at 721.) Dr. Carroll ordered magnetic resonance imaging,

("MRI"), of Parker's thoracic spine. (R. at 721.) The MRI, performed on July 16, showed minor disc bulging in the lower dorsal spine, but no acute or chronic compression fracture. (R. at 755-56.)

On July 31, Parker saw Dr. Carroll for a follow up on anxiety, depression, gastroesphogeal reflux and insomnia. (R. at 717.) Dr. Carroll noted that Parker felt "fair with few complaints," had a fair energy level and was gradually improving. (R. at 717.) He noted that Parker was compliant with her current medications and felt that they effectively managed her symptoms. (R. at 717.) Dr. Carroll stated that Parker's conditions had a moderate overall impact on her, with a mild emotional impact, moderate impact on recreation, mild impact on relationships and a moderate physical impact. (R. at 717.) Parker complained of daily, worsening, shooting and aching back pain that was constant since her last appointment and a severity of six on a scale of one to 10. (R. at 717.) Parker's anxiety symptoms were described as mild and occasional and included decreased concentration, excessive worry, malaise, muscle tension and nervous and anxious behavior. (R. at 717.) Parker's hypothyroid symptoms were described as stable and mild and included unexpected weight change, fatigue, weakness, hair loss, dry skin and fatigue. (R. at 717.) Parker also reported arthralgias, myalgias and back pain but denied gait problems, joint swelling, dysphoric mood, agitation and confusion. (R. at 719.) Dr. Carroll performed a physical examination and noted that Parker had tenderness and pain in her back; no thyroid mass; a normal range of motion, muscle tone and coordination; anxious, inattentive and moderately depressed mood; normal speech, judgment, thought content; and that Parker's cognition and memory were not impaired . (R. at 719-20.) On August 3, Parker requested a refill of Xanax, and it was refilled after Parker completed a urine drug screen. (R. at 715.) On August 25, Parker inquired

about the status of her Xanax prescription, as well as an Adderall prescription that Dr. Carroll had indicated he may prescribe Parker after he reviewed her recent lab work. (R. at 715.) On September 9, Parker saw Dr. Carroll to follow up on depression, hypothyroidism, anxiety and gastroesphogeal reflux. (R. at 818.) Parker reported feeling "good with minor complaints" and that she had a good energy level, was sleeping well and was gradually improving. (R. at 818.) Parker complained of daily, worsening, shooting and aching back pain that was a severity of six on a scale of one to 10. (R. at 819.) Parker's anxiety symptoms were described as mild and occasional and included decreased concentration, excessive worry, malaise, muscle tension, nervous and anxious behavior and restlessness. (R. at 819.) Parker's hypothyroid symptoms were described as stable and mild and included unexpected weight change, fatigue, weakness, hair loss, dry skin and fatigue. (R. at 819.) Parker also reported arthralgias, myalgias and back pain, but denied gait problems, joint swelling, dysphoric mood, agitation and confusion. (R. at 820-21.) Dr. Carroll performed a physical examination and noted that Parker no thyroid mass; a normal range of motion, muscle tone and coordination; an anxious, inattentive and depressed mood; normal speech, judgment and thought content; and that Parker's cognition and memory were not impaired. (R. at 821.) Dr. Carroll noted that Adderall was contraindicated for Parker, as it caused irritability and anger, and he prescribed methylphenidate for Parker's ADHD/ADD. (R. at 819, 822.)

On September 15, Parker called Dr. Carroll's office, stating that she had been waiting for a prescription for Vyvanse, a controlled stimulant for treating ADHD/ADD, "for two months," and Dr. Carroll initiated a prescription for it that day. (R. at 818.) On November 6, Parker requested a Xanax refill from Dr. Carroll, but their office verified that she already had a refill at the pharmacy, so a new

prescription was not initiated. (R. at 816.) On December 28, Parker requested that her Vyvanse dose be lowered, which Dr. Carroll did on January 7, 2021, after Parker completed a urine drug screen. (R. at 814-15.) On February 17, Parker requested a Xanax refill, which Dr. Carroll refilled that day. (R. at 813.) On March 2, Parker requested a refill of Effexor and Seroquel, which was completed after the doses were adjusted for insurance approval. (R. at 812.) On March 19, Parker requested a refill of Vyvanse, and Dr. Carroll's office told her she needed to follow up before it would be refilled. (R. at 812.) On March 22, Parker requested a prior authorization for the original, higher dose of Vyvanse, stating that she needed it as soon as possible. (R. at 811.)

On March 23, Dr. Carroll's nurse practitioner saw Parker for a follow up on depression, anxiety, hypothyroidism and ear pain. (R. at 804-5.) Parker's hypothyroid symptoms were described as mild and stable with associated symptoms including hair loss, dry skin, depression mood, loss of interest in activities, poor concentration, irritability and anxiety. (R. at 804.) Parker's anxiety was described as severe and causing significant distress, and symptoms included decreased concentration, depressed mood, excessive worry, irritability, malaise, muscle tension, panic, restlessness, and nervous and anxious behavior. (R. at 804-05.) Parker's depression was described as moderately severe, well-controlled with treatment, and included symptoms of depressed mood, loss of interest in activities, poor concentration, irritability and anxiety. (R. at 805.) The nurse practitioner found that Parker's depression was preceded by anxiety and worry about family stressors, but that Parker was able to do activities of daily living without limitations and able to work without limitations. (R. at 805.) Parker also reported that she had been experiencing gradual short-term memory loss over the last year, but Parker did not

feel that it had affected her ability to drive, cook and take her medications correctly. (R. at 805.) Parker further reported experiencing arthralgias, myalgias, back pain and neck pain but denied gait problems, joint swelling and neck stiffness. (R. at 806.) On physical examination, Parker was found to have normal strength, reflexes, muscle tone, coordination, range of motion and gait; a supple neck with no thyroid mass; normal speech, behavior and thought content; anxious and depressed mood; impulsivity with binge eating; and abnormal recent memory. (R. at 808.) The nurse practitioner made an ambulatory referral to psychiatry for the management of Parker's Xanax and Vyvanse. (R. at 810.) On March 26, Parker requested the status of her prior approval for her Vyvanse prescription, and was told by the office that she needed to complete a urine drug screen before it could be approved. (R. at 802-03.) On March 31, Parker requested a refill of her Xanax prescription, stating that she had taken her last dose the previous day. (R. at 802.)

On April 12, 2021, Parker saw Dr. Carroll's nurse practitioner for an annual examination. (R. at 795.) The nurse practitioner described the symptoms of Parker's hypothyroidism as mild, stable and managed by medication. (R. at 796.) The nurse practitioner told Parker that she could not prescribe her Vyvanse while she was on Xanax and referred her to psychiatry for management of ADHD/ADD, anxiety, depression and binge eating. (R. at 800-01.) On April 20, Parker contacted the office for a refill of her Xanax prescription, and it was refilled. (R. at 794-95.) On May 20, Parker again contacted the office for a refill of her Xanax prescription, and it was refilled. (R. at 794.)

On June 22, 2021, Dr. Carroll saw Parker to follow up on anxiety, depression, hypothyroidism and ADHD/ADD. (R. at 879.) Dr. Carroll conducted a depression

screening, and Parker scored "moderate" for depression. (R. at 882-83.) Parker reported having arthralgias, myalgias, neck pain, decreased concentration, depression, memory loss, nervousness, anxiety, irritability and unexpected weight change. (R. at 882.) She denied weight gain or loss, back pain, gait problems, joint swelling, neck stiffness, agitation, confusion, dysphoric mood, hallucinations, self-injury, sleep disturbances and suicidal ideas. (R. at 882.) On physical examination, Dr. Carroll did not detect any thyroid masses and found that her cervical back had a normal range of motion, supple neck and no muscular tenderness. (R. at 884.) Dr. Carroll further noted that Parker's wrists had swelling, tenderness, bony tenderness, crepitus and a decreased range of motion. (R. at 884.) He found that Parker's right hand had severe pain and bony tenderness with a decreased range of motion; decreased strength of finger abduction, thumb/finger opposition and wrist extension; and decreased sensation. (R. at 884.) Parker's left hand had tenderness and bony tenderness; decreased range of motion; decreased strength of finger abduction and wrist extension; and decreased sensation. (R. at 884.) Dr. Carroll found that Parker was inattentive, and her mood was "anxious and depressed (PTSD)" with normal speech, behavior, thought content, and judgment, and she did not exhibit impaired recent memory. (R at 884-85.) Despite noting that Parker still had an allergy to Adderall and had never followed up on her psychiatry referral, Dr. Carroll initiated Adderall twice daily. (R. at 880, 886.) That same day, Parker contacted Dr. Carroll's office to request a refill of her Xanax prescription and ask if Dr. Carroll was going to send a prescription in for Adderall. (R. at 993.) On July 6, Parker contacted Dr. Carroll's office to ask for insurance approval of the Adderall prescription. (R. at 985.) Dr. Carroll's office told her that she could pay approximately $35 for the medication out of pocket, but Parker stated that she could not pay that much and that she felt Dr. Carroll could approve the medication, not her insurance company. (R. at

985.) On July 7, Parker told the office that her family was going to help her pay for the Adderall. (R. at 984.)

On July 26, 2021, Parker followed up with Dr. Carroll for depression, anxiety and ADHD/ADD. (R. at 889, 979.) Parker reported that her depression symptoms included a depressed mood, loss of interest in activities, poor concentration, irritability and anxiety. (R. at 889, 979.) She reported that her depression was moderate and that she was able to do activities of daily living without limitations and able to work without limitations. (R. at 889, 979.) Parker indicated that her anxiety symptoms were severe and included decreased concentration, depressed mood, excessive worry, irritability malaise, muscle tension, anxiety, nervousness, panic and restlessness and that her symptoms caused significant distress and interfered with daily activities. (R. at 889, 979.) She reported that her ADHD/ADD symptoms included excessive talking, poor attention span, easy distractibility, difficulty following instructions, fidgeting, losing items, engaging in physically dangerous activities and shifting from one uncompleted task to another. (R. at 889-90, 979.) On physical examination, Dr. Carroll noted that Parker had a normal range of motion, her cervical back was not tender, and she had normal muscle tone and coordination. (R. at 893-94, 981-82.) Parker exhibited tenderness on her right thumb. (R. at 893.) Parker was inattentive, with an anxious and depressed mood, withdrawn behavior and normal thought content, memory, speech and judgment. (R. at 894.) Dr. Carroll discontinued Adderall and initiated Vyvanse. (R. at 895.) On September 1, Parker requested a refill of her Adderall prescription. (R. at 978.) On September 20, Parker requested a refill of her Xanax prescription. (R. at 977.) On October 26, Parker saw a physician assistant at the practice for an upper respiratory infection.

(R. at 974.) On November 3, Parker requested a refill of her Xanax prescription. (R. at 973.)

On November 20, 2021, Parker saw Dr. Jonathan Clark, M.D., at Appalachian Orthopaedic Associates, for follow up from a right lateral malleolus ankle fracture three days earlier. (R. at 906.) Dr. Clark noted tenderness to palpation, ecchymosis and swelling over the fracture site, but Parker did not complain of any muscle aches, muscle weakness, arthralgias, joint pain or back pain. (R. at 906.) Dr. Clark fitted Parker with a boot and advised her to avoid driving, as the fracture likely would cause delayed braking time. (R. at 906.) Dr. Clark noted that Parker complained of chronic pain in her right thumb and advised that she have x-rays of the right hand at her follow-up visit at his office. (R. at 906.) On December 20, Dr. Clark discontinued the boot on Parker's right ankle after imaging showed that the fracture was healing well. (R. at 904.) Dr. Clark noted that imaging of the right hand showed no fracture or dislocation, and normal alignment with bilateral thumb carpometacarpal osteoarthritis. (R. at 904.) Dr. Clark offered to give corticosteroid injections which Parker declined due to her history of Cushing's syndrome and Dr. Clark ordered thumb spica braces for Parker, asking her to follow up in three months for further assessment and imaging. (R. at 904.)

On January 12, 2022, Parker contacted Dr. Carroll's office and requested a refill of her Xanax prescription. (R. at 965.)  On February 13 and March 4, Dr. Carroll refilled medications related to Parker's anxiety, PTSD and depression, but the record does not state which medications he refilled. (R. at 964-65.) On March 25, Parker saw an advanced practice nurse for her ADHD/ADD and arthralgia. (R. at 958.) Parker reported having difficulty concentrating, as her Adderall and

Vyvanse had run out several weeks earlier. (R. at 958.) She indicated that her anxiety was somewhat controlled on her other medications, but the advanced practice nurse told Parker that taking Paxil and Effexor together with Seroquel was contraindicated and encouraged her to taper off Paxil and Effexor. (R. at 958.) Parker also complained of fatigue, weight gain, polydipsia, polyphagia, polyuria, arthralgias, persistent swelling and pain in the right thumb, decreased concentration, dysphoric mood, anxiety and nervousness. (R. at 960.) She denied back pain, gait problems, myalgias, neck pain and stiffness, agitation, confusion, hyperactivity and behavioral problems. (R. at 960.) On physical examination, the advanced practice nurse observed tenderness to flexion, extension, and palpation of all joints of the fingers and hands, bilaterally; osteoarthritis nodules on all joints of the fingers, bilaterally; normal range of motion; no rigidity or tenderness in the cervical back and neck; normal gait and coordination; normal behavior, thought content and judgment; and a pleasant mood. (R. at 961.) The advanced practice nurse also told Parker not to take Adderall and Vyvanse together, and refilled Parker's Adderall prescription. (R. at 962.) She also encouraged Parker to discontinue Adderall altogether, as it was contraindicated with Xanax. (R. at 963.)

Parker saw Michael Lilly, L.P.C., ("Lilly"), a licensed professional counselor, for behavioral health services at Frontier Heath from January 30, 2020, to August 12, 2021. Parker began seeing Lilly due to stressors, including her husband's recent suicide attempt and subsequent related incarceration and the loss of her job in May 2019 as an optometrist assistant. (R. at 638.) At her intake, Parker reported that her symptoms from the last week were a low mood, tearfulness, flash backs, nightmares, anger, irritability, difficulty staying asleep and a decreased appetite. (R. at 638.) On February 13, 2020, at Parker's first scheduled therapy appointment, she indicated

that she was "feeling some better since I first came in," and Lilly noted that she appeared mildly depressed, but improved from intake, and that her affect was congruent with her mood. (R. at 646.) At her next appointment on February 18, 2020, Parker reported feeling more depressed than she was at her last appointment, but not as depressed as she was at her first appointment shortly following her husband's mental health crisis. (R. at 647.) On February 27, Parker reported continued feelings of depression and occasionally feeling overwhelmed, but reported feeling positively that her husband's mental health had improved. (R. at 648.) Lilly noted that Parker maintained adequate eye contact, clear and coherent speech, intact judgment, and her affect was congruent with mood, which was within normal limits. (R. at 648.) On March 5, Parker reported feeling "a whole lot better" than she had at her first appointment. (R. at 649.) Lilly noted that Parker's mood was improved and within normal limits, her affect was congruent, speech was clear and coherent, and she had intact judgment. (R. at 649.) Lilly also screened Parker for anxiety and noted that she appeared to be experiencing high anxiety. (R. at 649.) On March 12, Parker reported feeling "quite a bit better" since her last appointment with Lilly, who noted that her mood was euthymic with a congruent affect, and she had clear and coherent speech and intact judgment. (R. at 650.) On March 19, Parker reported feeling like she had made progress in treatment, and Lilly noted that she had clear and coherent speech with intact judgement, her mood was within normal limits, and her affect was congruent. (R. at 651.) Parker also requested information for an anger management class, as she felt that attending one would be beneficial to her therapeutic goals, and Lilly provided her with information for one. (R. at 651.)

On May 14, 2020, Lilly unsuccessfully attempted to contact Parker regarding her scheduled therapy appointment. (R. at 652.) On May 20, Parker had a telephone

appointment where she expressed anxiety about Covid-19, and Lilly noted that her mood appeared to be depressed. (R. at 850.) On June 25, Parker reported that her primary care physician encouraged her to resume medication for her ADHD/ADD, but Parker expressed hesitance, feeling like the medications made her symptoms worse. (R. at 851.) Lilly noted that Parker's speech was clear and coherent with intact judgment, and she had a slightly depressed mood with a congruent affect. (R. at 851.) On July 2, Lilly unsuccessfully attempted to contact Parker after she missed her scheduled appointment. (R. at 852.) On September 8, Parker reported increased feelings of depression due to her husband's worsened mental health. (R. at 853.) Lilly noted that Parker appeared mildly depressed with a congruent affect, and she had clear and coherent speech with congruent judgment. (R. at 853.) On September 3, Lilly wrote a letter to the Social Security Administration, stating that, since May 21, 2020, Parker had attended two appointments and continued to be diagnosed with major depressive disorder, recurrent, severe; and generalized anxiety disorder. (R. at 773.) On September 21, Parker indicated having a "hard time with thinking about trying to get disability," feeling like her physical health prevented her from being able to work. (R. at 854.) Lilly noted that Parker's mood was slightly depressed, and her affect was congruent with her mood. (R. at 854.)

On September 28, Parker reported feeling anxious about an upcoming vacation to South Carolina, attributing the increase in anxiety to her adult daughter choosing to sit next to her father, Parker's ex-husband, at a sports game they mutually attended. (R. at 855.) Lilly found Parker to have clear and coherent speech with intact judgment, and she appeared to be anxious with a congruent affect. (R. at 855.) On October 12, Parker indicated that her trip to South Carolina with her husband had gone well. (R. at 856.) Lilly noted that her speech was clear and

coherent with intact judgment, and Parker's mood was within normal limits with a congruent affect. (R. at 856.) On December 1, Lilly unsuccessfully attempted to reach Parker to reschedule a cancelled appointment. (R. at 857.) On December 8, Lilly contacted Parker, who stated that she had forgotten about her appointment that day and requested to schedule a new one. (R. at 858.) On December 15, Parker reported feeling upset about marital problems she was having, and Lilly noted that, while her mood was slightly anxious, it was within normal limits with a congruent affect. (R. at 859.) On January 5, 2021, Parker told Lilly that she had recently decided to separate from her husband and was pursuing a new relationship, and Lilly noted that she had clear and coherent speech with intact judgment, and her mood was slightly anxious, but within normal limits. (R. at 860.) On January 12, 2021, Parker reported feeling stressed, attributing her feelings to working long hours for the elderly woman she was being paid to care for, as well as caring for her husband whose mental health had worsened. (R. at 861.) Lilly noted that she had clear and coherent speech with intact judgment, and her mood was depressed and tearful at times. (R. at 861.) On January 19, Parker cancelled her appointment and rescheduled it to a later time (R. at 862.) On February 9, Parker missed her appointment, and Lilly's attempt to reach her was unsuccessful. (R. at 863.) On February 15, Parker reached out to Lilly and rescheduled her appointment. (R. at 864.)

On March 2, Parker reported that her primary care physician had initiated her on a new ADHD/ADD medication, and she felt it was helping her. (R. at 865.) Lilly noted that Parker's mood was slightly anxious and, for the first time, slightly unfocused. (R. at 865.) On March 9, Parker reported that she had been considering moving to South Carolina to live with and care for an individual, but she was having second thoughts. (R. at 866.) Parker also mentioned that she felt her memory was

getting worse after her brain surgery in 2019 and that "the last MRI I had completed was two years ago and they haven't really followed up too much on it since." (R. at 866.) Parker worried about her memory because her family had a "history of potential [d]ementia or Alzheimer's." (R. at 866.) Lilly reported that Parker's speech was clear and coherent, her judgement was intact, and her mood appeared to be mildly depressed and occasionally tearful. (R. at 866.) On March 23, Parker reported feeling like her depression had been returning recently, but that attending therapy was helpful and alleviated her symptoms for a "couple days" after her appointments. (R. at 867.) Parker reported that she was no longer planning on moving to South Carolina, and she had recently reunited with her husband. (R. at 867.) Parker also reported that she scheduled an MRI through her primary care physician for her memory complaints, and stated that she had not taken her ADHD/ADD medication "in about three days," which was causing her to feel less focused. (R. at 867.) Lilly encouraged Parker to employ coping strategies that had helped her throughout her time in therapy, and Parker stated that she wanted "to feel less stressed and overwhelmed."(R. at 867.) Lilly noted that Parker was able to maintain adequate eye contact, openly verbalized her thoughts and feelings, had clear and coherent speech with intact judgment, and her mood was slightly depressed and occasionally tearful at times. (R. at 867.) Lilly attempted to plan a discharge from therapy with Parker, but Parker indicated that the therapy was helpful and she had no desire to be discharged from the practice at that time. (R. at 867.)

On April 15, Lilly called Parker to reschedule her appointment, and Parker indicated that she would make contact on the following Monday to do so. (R. at 868.) On April 23, Lilly called Parker in relation to scheduling her last missed appointment, and Parker stated that she did not attend her last appointment because

she "did not feel like getting out at all" and that she desired to reschedule her next appointment. (R. at 869.) On April 27, Parker contacted Lilly to ask if she could either reschedule her appointment or have it by telephone, and Lilly rescheduled her appointment. (R. at 870.) On May 4, Lilly noted that Parker neither attended her scheduled appointment nor make contact with Lilly to let him know that she would not be attending, and she did not answer Lilly's two phone calls. (R. at 871.) On May 14, Lilly called Parker, who that she was "on the phone with some other doctors" and would call Lilly back at a later time to reschedule her appointment. (R. at 872.) On June 7, Lilly mailed a closure letter to Parker. (R. at 873.) On June 15, Parker called the office asking to speak with Lilly, who unsuccessfully attempted to return Parker's call. (R. at 929.) On June 17, Parker advised Lilly she wanted to continue therapy, but she wanted to schedule an appointment after her appointment with a psychiatrist that day. (R. at 930.) Lilly attempted to follow up with Parker, but was unable to reach her. (R. at 931.) On June 24, Lilly was able to speak with Parker, and they scheduled an appointment for July 9. (R. at 932.) On July 9, Parker contacted Lilly, stating that she had overslept and needed to reschedule her therapy appointment. (R. at 933.) On the date of her next scheduled appointment, July 20, Parker did not attend, indicating to Lilly that she had forgotten about it. (R. at 934.) After unsuccessfully attempting to reschedule that appointment, Lilly sent Parker a second closure letter on August 12. (R. at 935.)

On December 2, 2019, Stephen Saxby, Ph.D., a state agency psychologist, attempted to complete a Psychiatric Review Technique form, ("PRTF"), but he was unable to obtain activities of daily living from Parker, despite numerous attempts. (R. at 94, 96-97.) Thus, he concluded there was insufficient evidence to evaluate Parker's claims. (R. at 97.) On September 26, 2020, Leslie Montgomery, Ph.D.,

("Montgomery"), a state agency psychologist, completed a PRTF on Parker, finding that Parker was moderately limited in her ability to understand, remember, and apply information and to concentrate, persist and maintain pace. (R. at 123-25.) She found Parker was mildly limited in her ability to interact with others and to adapt or manage herself. (R. at 123.) Montgomery opined Parker was capable of performing routine, unskilled work. (R. at 125.) On September 28, 2020, Montgomery also completed a mental residual functional capacity assessment of Parker, in which she opined that Parker could recall short and simple instructions but would have difficulty with complex or detailed instructions. (R. at 130-35.) Montgomery further opined that Parker could complete a normal workday with minimal need for accommodation, she would be able to interact with the public for brief periods, and she could best perform in a setting with only a few co-workers and a well-spaced location due to her distractibility. (R. at 132-33.) Lastly, Montgomery found that Parker would require assistance adapting to change unless it was infrequent or implemented gradually. (R. at 134.)

On December 3, 2019, Dr. Wyatt S. Beazley, III, M.D., a state agency physician, completed a medical assessment, finding that Parker could perform medium work. (R. at 97-98.) On September 26, 2020, Dr. Robert McGuffin, M.D., a state agency physician, completed a medical assessment, also finding Parker could perform medium work. (R. at 127-30.)

On September 10, 2020, Yaiza Vidal Sostre, M.A., Q.M.H.P., ("Vidal Sostre"), a qualified mental health professional, conducted a consultative psychological examination of Parker. (R. at 782-86.) Parker reported depression, memory problems, "a prior removal of a Cushing tumor in her brain," thyroid issues,

possible lupus and a fractured spine. (R. at 783.) Parker indicated that she required moderate assistance to complete activities of daily living, specifically noting that she occasionally forgot to mail bills and that she sometimes experienced pain while walking or doing laundry. (R. at 783-84.) Parker indicated that she had never seen a psychiatrist, but currently was seeing a psychologist and had been since February 2020. (R. at 784.) Vidal Sostre found that Parker had average working memory skills, mildly compromised delayed recall and below average attention and concentration. (R. at 785.) Vidal Sostre diagnosed Parker with mild, persistent depressive disorder, with pure dysthymic syndrome (R. at 785.) Vidal Sostre found that Parker was "mildly" impaired in most areas, but "moderately" impaired in Parker's ability to perform work activities without special or additional supervision; to complete a normal workday or workweek without interruptions resulting from her psychiatric condition; to interact with co-workers and the public; and to deal with the usual stresses encountered in competitive work. (R. at 786.) Vidal Sostre rated Parker's prognosis as good. (R. at 785.)

On March 26, 2022, Dr. Raymond Ryan, M.D., conducted a medical consultative examination of Parker. (R. at 937-42.) Parker reported to Dr. Ryan that her current medical conditions were a brain tumor in remission, Cushing's syndrome, depression, PTSD, anxiety, ADHD/ADD, memory loss, hand weakness, hand pain, arthritis, migraines, irritable bowel syndrome and degenerative disease in the neck. (R. at 937.) She reported that her primary physical symptoms were weakness, stiffness, dizziness, nausea, fever and fatigue, and she occasionally experienced a dull, achy and sharp pain in both legs with an intensity of six on a scale of one to 10. (R. at 937.) Parker indicated that nothing helped to relieve her pain, sitting, walking and standing made it worse, and she was able to sit for only

thirty minutes at a time, stand for only fifteen minutes and had difficulty carrying and handling objects. (R. at 937.) Parker stated that her current mental health symptoms included crying spells, changes in appetite, fatigue, mood swings, lack of motivation, panic attacks, night terrors and difficulty sleeping and concentrating. (R. at 937.) Parker denied receiving psychiatric counseling, but indicated she was on psychiatric medications. (R. at 937.) Dr. Ryan conducted a physical examination and found that Parker had an appropriate mood, clear thought processes, good concentration and slightly abnormal memory, scoring 28/30 on a mini mental exam. (R. at 939.) Dr. Ryan further observed that Parker had a slow, unsteady gait with poor hand eye coordination. (R. at 939.) Dr. Ryan noted that Parker had mild tenderness to palpation of the lower back and bilateral legs and was unable to button and unbutton a shirt, pick up a coin from a table, grasp a pen or write a sentence. (R. at 940.) Parker was able to squat and rise from a squatting position with moderate difficulty, rise from a sitting position without assistance and had no difficulty getting up and down from the examination table. (R. at 940.) Parker could walk on heels and toes with mild difficulty, but not hop on either foot, bilaterally, and she was noted to be able to dress and undress adequately well. (R. at 940.) Parker was further observed to have a full range of motion in all areas that Dr. Ryan assessed, including her hands. (R. at 941.) Dr. Ryan concluded that Parker could be expected to sit for 60 minutes, stand 45 minutes, and walk 30 minutes at a time in an 8-hour workday before requiring a break, and he felt like Parker would benefit from an assistive device when navigating long distances or uneven terrain, and she could occasionally bend, stoop, crouch and squat. (R. at 942.) Dr. Ryan further noted that there were no manipulative limitations on Parker's ability to reach, handle, feel, grasp, finger, push or pull, which she could perform frequently. (R. at 942.) Lastly, Dr. Ryan opined

Parker would have communicative limitations due to short-term memory loss and decreased right hearing. (R. at 942.)

### III. Analysis

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2023). *See also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to her past relevant work; and 5) if not, whether she can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4) (2023).

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C. §§ 423(d)(2)(A). 1382c(a)(3)(A)-(B); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Parker argues that the ALJ's decision is not based on substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief") at 12-14.) Specifically, Parker argues the ALJ failed to properly evaluate the opinion evidence from Vidal Sostre, Montgomery, and Dr. Ryan. (Plaintiff's Brief at 11-21.) Parker also argues that the ALJ erred by failing to give appropriate credence to her allegations and properly assess the effect of pain on her ability to perform substantial gainful activity. (Plaintiff's Brief at 21-25.)

Parker filed her applications in May 2019; thus, 20 C.F.R. §§ 404.1520c, 416.920(c) govern how the ALJ considered the medical opinions here.[6] When making a residual functional capacity assessment, the ALJ must assess every medical opinion received in evidence. The regulations provide that the ALJ "will not

---

[6] 20 C.F.R. §§ 404.1520c, 416.920c applies to claims filed on or after March 27, 2017. *See* Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01, 2017 WL 168819 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132-01, 2017 WL 1105368 (Mar. 27, 2017)).

defer or give any specific evidentiary weight, including controlling weight" to any medical opinions or prior administrative medical findings, including those from the claimant's medical sources. 20 C.F.R. §§ 404.1520c(a), 416.920c(a) (2023). Instead, an ALJ must consider and articulate how *persuasive* he finds all the medical opinions and all prior administrative medical findings in a claimant's case. *See* 20 C.F.R. § 404.1520c(b), (c)(1)-(5), 416.920c(b), (c)(1)-(5) (2023) (emphasis added). Moreover, when a medical source provides more than one opinion or finding, the ALJ will evaluate the persuasiveness of such opinions or findings "together in a single analysis" and need not articulate how he or she considered those opinions or findings "individually." 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1) (2023).

The most important factors in evaluating the persuasiveness of these medical opinions and prior administrative medical findings are supportability and consistency, and the ALJ will explain how he considered these two factors in his decision. *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2) (2023). "Supportability" means "[t]he extent to which a medical source's opinion is supported by relevant objective medical evidence and the source's supporting explanation." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). "Consistency" denotes "the extent to which the opinion is consistent with the evidence from other medical sources and nonmedical sources in the claim." Revisions to Rules, 82 Fed. Reg. at 5853; *see also* 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The ALJ is not required to explain the consideration of the other three factors, including relationship with the claimant, specialization and other factors such as an understanding of the disability program's

policies and evidentiary requirements.[7] *See* 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

A claimant's residual functional capacity refers to the most the claimant can still do despite her limitations. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2023). The ALJ found Parker had the residual functional capacity to perform medium work, except she could frequently perform postural activities; frequently handle; occasionally finger; understand, remember and apply simple instructions; perform simple, unskilled tasks; occasionally interact with others, but should work independently and not in tandem with others; adapt to occasional changes in a customary workplace setting, and be off task 10 percent of the workday. (R. at 46.)

First, Parker argues that the ALJ erred in evaluating the opinion of consultative examiner, Dr. Ryan. (Plaintiff's Brief at 16-17.) Specifically, Parker argues that the ALJ's evaluation of Dr. Ryan's opinion was not supported by or consistent with the record. (Plaintiff's Brief at 16.) Dr. Ryan found that Parker could not be expected to carry any significant amount of weight with regularity, that she may benefit from using a cane and was limited to only occasional bending, stooping, crouching and squatting. (R. at 52, 942.) Dr. Ryan further opined that Parker could sit for 60 minutes, stand for 45 minutes and walk for 30 minutes before requiring a break. (R. at 52, 942.) Additionally, Dr. Ryan opined that there were "relevant communicative limitations" due to short-term memory loss and decreased hearing

---

[7] An exception to this is that when the ALJ finds that two or more "medical opinions or prior administrative medical findings about the same issue are both equally well-supported [] and consistent with the record [] but are not exactly the same," the ALJ will explain how he considered the other most persuasive factors including: the medical source's relationship with the claimant, specialization and other factors that tend to support or contradict a medical opinion. 20 C.F.R. §§ 404.1520c(b)(3), 416,920c(b)(3) (2023).

and "relevant environmental limitations" due to some imbalance. (R. at 52, 942.) The ALJ found Dr. Ryan's opinion unpersuasive, as it was inconsistent with examinations from primary care providers. (R. at 52.) In support of that assertion, the ALJ points to his earlier discussion of primary care records that do not show that Parker ambulated with a cane or appeared off-balance and that she regularly had a normal gait and coordination. (R. at 47, 50, 52.) The ALJ noted that Parker typically had normal neck and back examinations, overall, and records from 2022 reflected no weakness or incoordination. (R. at 52.) Further, the ALJ points to Parker's late 2021 appointments with Dr. Clark at Appalachian Orthopaedic Associates, which show mild findings in imaging and evaluation of Parker's hands. (R. at 52, 904, 961, 982, 991.) Based on the foregoing, I find that the ALJ's analysis of Dr. Ryan's medical opinion was proper, and that his finding is supported by substantial evidence.

Second, Parker argues that the ALJ erred in evaluating the medical opinion state agency psychologist Montgomery. (Plaintiff's Brief at 17-18.) Specifically, Parker argues that Montgomery's opinions that she was limited to performing routine work and required a "well-spaced" work location were inconsistent with the ALJ's findings. (R. at 20.) Referencing the routine work restriction, Montgomery found that Parker "[w]ould be able to perform only very familiar or extremely routine procedures" and that she "[w]ould be able to complete a normal work week and to perform at a pace generally consistent with others, with only minimal need for accommodations on an infrequent basis." (R. at 132.) The ALJ found that Montgomery's restriction to a "well-spaced" work location was vague, but included in his residual functional capacity finding limitations that Parker required independent work that was not in tandem with others and only occasional interaction

-33-

with others. (R. at 46.) Parker further argues that the ALJ's findings "fail to reflect the need for procedures to be very familiar or extremely routine." (Plaintiff's Brief at 18.) However, the ALJ included in his functional capacity finding that Parker could "understand, remember, and apply simple instructions and perform simple unskilled tasks" and would be off task for 10 percent of the workday. (R. at 46.) Based on the foregoing, I find that the ALJ properly found Montgomery's opinion partially persuasive, and his finding is supported by substantial evidence.

Third, Parker argues that the ALJ erred by improperly evaluating the opinion evidence of Vidal Sostre, M.A., Q.H.M.P, and her supervisor, Carol S. McCleary, Psy.D. (Plaintiff's Brief 18-19.) Parker argues that the ALJ's residual functional capacity finding is inconsistent with Vidal Sostre's opinion that Parker was "moderately" limited in her ability to perform work activities without special or additional supervision, to complete a normal workday or workweek without interruptions resulting from her psychiatric condition, to interact with co-workers and the public and to deal with the usual stresses encountered in competitive work. (Plaintiff's Brief at 18-19.) Parker essentially argues that by the ALJ agreeing that Parker is limited in some of the same areas in which Vidal Sostre found a "moderate" limitation, that he cannot then find that Vidal Sostre's use of the term "moderate" is vague. (Plaintiff's Brief at 19.) However, the ALJ was referencing the definition of "moderate" on Vidal Sostre's report, which is defined therein to mean "[s]ome problems that might be successfully dealt with through modifications or accommodations." (R. at 786.) Vidal Sostre did not cite specific reasons why Parker was "moderately" limited in any area or what accommodations or modifications would remedy the deficits, but the ALJ incorporated the functional deficits that were supported by the record in making his residual functional capacity assessment,

including that Parker was limited in her ability to interact with others, to complete a workday without interruption and stress and to perform detailed and complex tasks. (R. at 51.) Therefore, the ALJ's decision to find Vidal Sostre's opinion mostly unpersuasive is supported by substantial evidence.

Next, Parker argues that the ALJ did not properly consider her allegations of pain and impaired memory. (Plaintiff's Brief at 21-25.) The Fourth Circuit recently reiterated the two-step framework, set forth in 20 C.F.R. §§ 404.1529, 416.929, and Social Security Ruling, ("S.S.R."), 16-3p, 2017 WL 5180304 (Oct. 25, 2017), for evaluating a claimant's symptoms, such as pain.[8] *See Arakas v. Comm'r, Soc. Sec. Admin.*, 983 F.3d 83 (4th Cir. 2020). First, the ALJ must determine whether objective medical evidence[9] presents a "medically determinable impairment" that could reasonably be expected to produce the claimant's alleged symptoms. *Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig v. Chater*, 76 F.3d 585, 594 (4th Cir. 1996). Second, after finding a medically determinable impairment, the ALJ must assess the intensity and persistence of the alleged symptoms to determine how they affect the claimant's ability to work and whether she is disabled. *See Arakas*, 983 F.3d at 95 (citations omitted); *see also Craig*, 76 F.3d at 595. Because "[s]ymptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques," ALJs must consider the entire case record and may "not disregard an individual's statements about the intensity, persistence, and limiting effects of

---

[8] "Symptoms" are defined in the regulations as a claimant's own description of her medical impairment. *See* 20 C.F.R. §§ 404.1502(i), 416.902(n) (2023).

[9] The regulations define "objective medical evidence" as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

symptoms solely because the objective medical evidence does not substantiate" them. S.S.R. 16-3p, 2017 WL 5180304, at *5; *see also* 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2); *Craig*, 76 F.3d at 595. In other words, "while there must be objective medical evidence of some condition that could reasonably produce the pain, there need not be objective evidence of the pain itself or its intensity." *Walker v. Bowen*, 889 F.2d 47, 49 (4th Cir. 1989); *see also Craig*, 76 F.3d at 593.

However, the Fourth Circuit has held that objective medical evidence and other objective evidence are "crucial" in evaluating the second prong of the symptom analysis test. *Craig*, 76 F.3d at 595. In *Craig*, the Fourth Circuit stated, "[a]lthough a claimant's allegations about her pain may not be discredited solely because they are not substantiated by objective evidence of the pain itself or its severity, they need not be accepted to the extent they are inconsistent with the available evidence, including objective evidence of the underlying impairment, and the extent to which that impairment can reasonably be expected to cause the pain the claimant alleges she suffers." 76 F.3d at 595. Specifically, the ALJ must consider "any inconsistencies in the evidence and the extent to which there are any conflicts between [the claimant's] statements and the rest of the evidence, including [her medical] history, the signs and laboratory findings, and statements by [her] medical sources or other persons about how [her] symptoms affect [her]." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c)(4) (2023). The regulations direct that a claimant's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities . . . to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §§ 404.1529(c)(4), 416.929(c).

Here, the ALJ stated as follows in his decision:

> … [T]he undersigned has considered all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and 416.929 and SSR 16-3p.
>
> … In considering the claimant's symptoms, the undersigned must follow a two-step process in which it must first be determined whether there is an underlying medically determinable … impairment[s] … that could reasonably be expected to produce the claimant's pain or other symptoms.
>
> Second, once an underlying … impairment[s] that could reasonably be expected to produce the claimant's pain or other symptoms has been shown, the undersigned must evaluate the intensity, persistence, and limiting effects of the claimant's symptoms to determine the extent to which they limit the claimant's work-related activities. For this purpose, whenever statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence, the undersigned must consider other evidence in the record to determine if the claimant's symptoms limit the ability to do work-related activities.

(R. at 46.) The ALJ next turned to an analysis of Parker's symptoms, stating, in part, "[a]fter careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms. …" (R. at 46.) Thus, the ALJ satisfied the first part of the two-part test for analyzing Parker's allegations about her symptoms. *See Arakas*, 983 F.3d at 95; *Craig*, 76 F.3d at 594. The real issue, therefore, is whether he correctly analyzed Parker's symptoms under the second part of this test. For the reasons that follow, I find that he did.

In his decision, the ALJ stated, "the claimant's statements concerning the intensity, persistence and limiting effects of [her] symptoms [are] not entirely consistent with the medical evidence and other evidence in the record." (R. at 46.) Parker contends that the ALJ failed to properly evaluate her allegations, arguing that the ALJ did not cite clear and direct support for rejecting Parker's reported symptoms. (Plaintiff's Brief. at 23.) In support of her assertion, Parker references a June 22, 2021, appointment with Dr. Carroll where Parker was observed to have swelling and tenderness of both hands with a decreased range of motion. (R. at 884.) At the June 2021 appointment, Dr. Carroll referred Parker to orthopedic surgery, but Parker did not see an orthopedic doctor until November 2021. (R. at 885, 906.) Further, Parker was initially referred to physical therapy and a hand specialist in April of 2020, but never followed up on that referral. (R. at 578.) Parker also points to a physical examination at Dr. Carroll's office on March 25, 2022, finding that Parker had bilateral tenderness to flexion, extension, and palpation on both hands, and she argues that these records provide "uncontradicted support" for her symptom allegations. (Plaintiff's Brief at 24-25.) Lastly, Parker points to a reference by the ALJ that her orthopedic physician did not order follow-up appointments, when, in fact, a follow up was ordered. (Plaintiff's Brief at 23; R. at 49, 904.) While the record does reflect that Dr. Clark ordered a follow-up appointment, there is also no indication in the record that Parker attended that appointment or ever saw Dr. Clark again. (R. at 904.) If Parker's upper extremity limitations were severe, then her adherence to her physician's recommended treatment schedule would be expected. Notably, Parker's follow-up appointment with Dr. Clark was scheduled on March 22, 2022, three days before she complained of continued pain in her hands at Dr. Carroll's office. SSR 16-3p states that "[p]ersistent attempts to obtain relief of

symptoms, such as increasing dosages and changing medications, trying a variety of treatments, [or] referrals to specialists, . . . may be an indication that an individual's symptoms are a source of distress and may show that they are intense and persistent." 2017 WL 5180304, at *9. In this case, while the ALJ erred by stating that Dr. Clark did not order any follow-up appointments, the fact that Parker did have a follow-up appointment but did not attend it is unlikely to have changed the ALJ's finding as to the severity of Parker's symptoms. In fact, Parker's decision not to pursue recommended treatment for her hand pain supports the ALJ's finding that her subjective complaints of pain were somewhat inconsistent with the record.

Parker further contends that her symptoms of ADHD/ADD were more severe than the ALJ found, citing multiple providers' observations of inattentiveness. (Plaintiff's Brief at 24.) The ALJ addresses the same observations, noting that Parker "sometimes appeared slightly unfocused or inattentive, but again had normal findings otherwise." (R. at 50.) The ALJ points to the May 2020 appointment where Parker first requested medication for her ADHD/ADD, noting that her provider told her she needed to wean off of Xanax before she could initiate Adderall. (R. at 47, 729.) The July and September 2020 appointments that Parker references as support that she was experiencing severe ADHD/ADD symptoms occurred before Parker had been prescribed medication for ADHD/ADD. (R. at 720, 821-22.) The June and July 2021 appointments that Parker references where she was observed to be "inattentive" occurred when she was taking Adderall, despite charting that Parker had an allergy to Adderall because it made her "irritable" in both appointment notes. (R. at 800, 884, 886, 890, 894-895.) While Parker was referred twice to a psychiatrist for management of her ADHD/ADD medications, she never followed up on that referral. (R. at 801, 886.) The ALJ noted that Parker's treatment for the allegedly

disabling impairments was essentially routine, conservative and/or successful. (R. at 49.) Specifically, the ALJ noted that "[w]hen a claimant alleges significant mental symptoms, such as poor memory, concentration, and social functioning, the undersigned would expect that her treating practitioners would note abnormalities on mental status examinations." (R. at 50.) The ALJ pointed to mostly normal mental status examinations of Parker, including the infrequent findings that Parker was inattentive or slightly unfocused. (R. at 50.)

Based on the foregoing, I find substantial evidence exists to support the ALJ's evaluation of the opinion evidence and his residual functional capacity finding.

## PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1.  Substantial evidence exists in the record to support the ALJ's evaluation of the opinion evidence;

2.  Substantial evidence exists in the record to support the ALJ's residual functional capacity finding; and

3.  Substantial evidence exists in the record to support the Commissioner's finding that Parker was not disabled under the Act and was not entitled to DIB and SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Parker's motion for summary judgment, grant the Commissioner's motion for summary judgment and affirm the Commissioner's decision denying benefits.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, Senior United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:    March 6, 2024.

_/s/ Pamela Meade Sargent_
UNITED STATES MAGISTRATE JUDGE